INFORMATION COPY
MANDATE NOT YET ISSUED
DIS. CT. # 02-530

NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

No. 03-3733

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
OCT 2 2 2004
LEONARD GREEN, Clerk

NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

Sixth Circuit Rule 28(g) limits citation to specific situations. Please see Rule 28(g) before citing in a proceeding in a court in the Sixth Circuit. If cited, a copy must be served on other parties and the Court.
This notice is to be prominently displayed if this decision is reproduced.

| | |
|---|---|
| JUSTIN FARMER, | ) |
| Plaintiff-Appellant, | ) |
| v. | ) ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| THE SQUARE D COMPANY, | ) |
| Defendant-Appellee. | ) |

Before: GILMAN and ROGERS, Circuit Judges; FORESTER, District Judge.[*]

**KARL FORESTER, Chief District Judge.** The Plaintiff-Appellant Justin Farmer ("Farmer") participated in a severance pay plan while employed by Square D Company ("Square D"). The plan, governed by the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq., paid benefits to any participant whose employment was "involuntarily terminated" by his employer on account of a "facility closure." In November 2001, Square D notified Farmer that it was closing the facility at which Farmer worked and that Farmer's employment would terminate in January 2002. Later in November, Farmer resigned from his position at Square D to take another job, and he sought benefits under the plan. The plan's administrator denied Farmer benefits, finding that Farmer had not been "involuntarily terminated" but instead had "voluntarily resigned" from his position. After the appeals

---

[*]The Honorable Karl S. Forester, Chief Judge of the United States District Court for the Eastern District of Kentucky, sitting by designation.

committee upheld the administrator's decision, Farmer filed suit in the district court pursuant to 29 U.S.C. § 1132(a)(1)(B). The district court granted Square D's motion to uphold the administrative decision, and Farmer appealed. We **AFFIRM**.

## BACKGROUND

Square D hired Farmer as a manufacturing supervisor at its Middletown, Ohio facility on July 17, 2000. J.A. at 85. As a salaried employee, Farmer participated in the Square D Company Severance Pay Plan for Salaried Employees (the "Plan"), an "employee welfare benefit plan" under ERISA. The Plan was designed to "provide severance benefits to eligible employees who involuntarily terminate employment with the employers under certain conditions" J.A. at 12 (Plan, § 1.1). In particular, Section 3.1 of the Plan provided:

> [A] participant whose employment with [Square D] is involuntarily terminated by action of [Square D] on account of any of the following reasons and other than for proper cause . . . will be entitled to receive a severance pay benefit determined under subsection 3.3 of the plan:
>
> (a) Facility closure.
>
> (b) Sale of all or any part of an employer.
>
> (c) Permanent reduction in work force.
>
> (d) Permanent position elimination.

J.A. at 15 (Plan, § 3.1). However, Section 3.2 of the Plan denies benefits to any otherwise eligible participant (a) "who is offered alternative employment at any facility or place of business of the employer," (b) "who is offered alternative employment with a successor employer to commence promptly following termination," or (c) "whose termination of employment is not due to one or more of the reasons set forth in subsection 3.1." J.A. at 15-16 (Plan, § 3.2).

The Plan named the Square D Company Employee Benefits Administrative Committee (the "Committee") as the plan administrator. J.A. at 13 (Plan, § 1.4). The Committee was vested with "the discretionary authority to construe and interpret the provisions of the plan and make factual determinations thereunder, including the power to determine the rights or eligibility of employees or participants and any other persons, and the amounts of their benefits under the plan, and to remedy ambiguities, inconsistencies or omissions," and was authorized to delegate "such powers, rights and duties as the committee may consider necessary or advisable to properly carry out administration of the plan." *Id.* Finally, "[a]ny interpretation of the plan and any decision on any matter within the discretion of the committee made by the committee in good faith is binding on all persons." J.A. at 21 (Plan, § 7.3).

In June 2001, Square D announced that it planned to close the Middletown facility and consolidate it with a nearby facility in Oxford, Ohio. J.A. at 85. On July 19, 2001, Farmer's supervisor informed him that Square D had not yet found a position for him at the Oxford facility. J.A. at 44, 85. On November 12, 2001, Farmer received a letter from Square D, sent in conformance with the Worker Adjustment Retraining Notification Act (the "WARN Act"), advising that his employment would terminate in January 2002. Specifically, the letter read:

> This letter will serve as notice that the Middletown facility of Square D Company . . . is permanently discontinuing its operations . . . and relocating to Oxford, Ohio. Actual shut down is expected to occur during the first quarter of 2002. Based on our current plans, your employment will terminate within the two-week period beginning on January 11, 2002. This action is expected to be permanent. There are no bumping rights with respect to this operation.
>
> The Company will provide you with severance pay according to the Company's Severance Plan. Outplacement will be made available to you. . . . .

J.A. at 34.

Farmer soon found another job, which would start on December 3, 2001. J.A. at 104. On November 16, 2001, Farmer informed Square D that he was resigning effective November 30, 2001, in order to take the other job. *Id.* On or around November 30, 2001, Farmer inquired about his eligibility for severance pay benefits, and Square D's human resources manager, Ashley Gerver, informed him that he would not receive benefits if he left prior to the January termination date. *Id.* Gerver suggested that Farmer attempt to renegotiate his start date with his new employer, which Farmer agreed to do. *Id.* Farmer's efforts were unsuccessful, and his last day of work was November 30, 2001. *Id.*

On December 1, 2001, Farmer submitted a claim for severance pay in the amount of $6,461.53. J.A. at 36-37. Gerver, to whom the Committee had delegated claims-handling authority, denied Farmer's claim, reasoning that Farmer "was not involuntarily terminated; he voluntarily resigned his employment." J.A. at 41. Farmer appealed to the Plan's Appeals Committee, which upheld Gerver's decision. J.A. at 55. The Appeals Committee determined that:

> Mr. Farmer's termination does not meet any of the requirements under Section 3.1 of the Plan since Mr. Farmer voluntarily terminated his employment. Mr. Farmer chose to part with Square D Company as a result of his finding employment outside the Company at the end of November 2001, even though Square D had a position for him until at least January 11, 2002.

*Id.*

Farmer then filed suit in the United States District Court for the Southern District of Ohio to recover the benefits pursuant to 29 U.S.C. § 1132(a)(1)(B). J.A. at 4. On April 10, 2003, the district court granted Square D's Motion to Uphold the Administrative Decision. J.A. at 71. The court found that

the parties each urge a reasonable interpretation of the Plan language in light of the absence of a Plan provision dictating when employment is considered terminated. Plaintiff's interpretation considers that employment may be considered terminated when the employee is informed in unequivocal terms that he will [no] longer be employed, even if the effective date of the termination is some period of time hence. On the other hand, Defendant's interpretation considers that employment may be considered not to have been terminated until the effective date of the decision to discharge the employee, regardless of when the employee is informed of that decision. Ordinary people might consider either interpretation to be consistent with the plain meaning of the Plan language.

\* \* \*

The Court is not at all convinced that Defendant's interpretation is the only reasonable one, or even the better of the two reasonable interpretations urged by the parties. The Court is not persuaded, however, that Defendant's interpretation is unreasonable. Accordingly, in light of the discretion vested in the Plan administrator by the Plan, the Court is precluded from determining that Defendant's interpretation is arbitrary and capricious.

J.A. at 69-71. Farmer timely appealed. J.A. at 73.

## ANALYSIS

"In an action challenging the denial of benefits under 29 U.S.C. § 1132(a)(1)(B), a plan administrator's decision is reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Shelby County Health Care Corp. v. S. Council of Indus. Workers Health and Welfare Trust Fund*, 203 F.3d 926, 933 (6th Cir. 2000) (internal quotation marks omitted). "If the benefit plan does grant such authority, the plan administrator's decision to deny benefits is reviewed under the 'arbitrary and capricious' standard of review." *Id.*

Here, the Plan grants the Committee the discretionary authority to construe and interpret the provisions of the plan and make factual determinations thereunder, including the power to determine the rights or eligibility of employees or participants and any other persons, and the

amount of their benefits under the plan, and to remedy ambiguities, inconsistencies or omissions. J.A. at 13 (Plan, § 1.4). The parties agree that this language represents a clear grant of authority triggering the arbitrary and capricious standard of review.

"The arbitrary and capricious standard is the least demanding form of judicial review of administrative action." *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 710 (6th Cir. 2000) (quotation marks omitted). "When applying this deferential standard, [the court] must decide whether the plan administrator's decision was rational in light of the plan's provisions." *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997) (internal quotation marks omitted). "A decision is not arbitrary and capricious if it is based on a reasonable interpretation of the plan." *Shelby County*, 203 F.3d at 933. This court reviews de novo a district court's decision as to whether a plan administrator acted arbitrarily and capriciously in denying benefits to a participant. *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996).

Farmer maintains that, in denying him benefits, the administrator impermissibly added a "must stay" term to the Plan. He emphasizes that, even under the arbitrary and capricious standard of review, a court will not uphold a denial of benefits unless the administrator reasonably bases its decision on the language of the plan. *See Shelby County*, 203 F.3d at 935. He asserts that, under the plain language of the Plan, he was "involuntarily terminated" when he received the WARN Act letter, and he stresses that the Plan does not expressly require a participant who receives a notice of "termination" to remain at his job to retain his "involuntarily terminated" status. He notes that Section 3.2 of the Plan enumerates only three circumstances, none of which are present here, that render an otherwise eligible participant ineligible for severance pay. Because no language exists in the Plan to support the administrator's

6

interpretation, he concludes, its interpretation is arbitrary and capricious.

Square D responds that, in denying Farmer's claim, the administrator properly undertook the three-part analysis mandated by the plain language of the Plan. First, the administrator must determine whether the participant was "involuntarily" terminated. Second, if the first question is answered in the affirmative, the administrator must determine whether the participant was "involuntarily terminated" for one of the reasons listed in Section 3.1. Third, if the second question is answered in the affirmative, the administrator must determine whether one of the exclusions set forth in Section 3.2 apply. Square D notes that the Plan does not define "involuntary termination" and vests the administrator with the discretionary authority "to construe and interpret the provisions of the plan . . . and to remedy ambiguities, inconsistencies or omissions." J.A. at 13 (Plan, § 1.4).

Square D insists that, in applying the first step of the analysis, the administrator correctly determined that Farmer was not "involuntarily terminated" because Farmer resigned before the date of termination identified in the WARN Act letter. In short, Square D contends that the administrator reasonably construed Section 3.1 to provide that an employee is "terminated" when he actually leaves his job—not when he receives notice that his employment will end at some future date.

The district court properly concluded that the administrator's decision constituted a "reasonable interpretation" of the Plan's language. *Shelby County*, 203 F.3d at 935. Contrary to Farmer's argument, both Gerver and the Appeals Committee relied on the language of the Plan in making their decision, concluding that Farmer was "terminated" on November 30, 2001, the effective date of his resignation, but that this "termination" was not "involuntary" because

Farmer could have continued to work at the Middletown facility until at least January 11, 2002. The Plan does not define the phrase "involuntarily terminated," and, at most, the phrase is ambiguous when applied to the facts at bar. The Plan grants the administrator "the discretionary authority to construe and interpret the provisions of the plan . . . and to remedy ambiguities," (J.A. at 13 (Plan, § 1.4)), and Gerver and the Appeals Committee therefore were entitled to "great leeway in interpreting ambiguous terms." *Id.* (quoting *Moos v. Square D Co.*, 72 F.3d 39, 42 (6th Cir. 1995)); *see also James v. Gen'l Motors Corp.*, 230 F.3d 315, 317 (7th Cir. 2000) ("We do not interfere with the plan administrator's decision unless he not only made the wrong call but a downright unreasonable one.") (internal quotation marks and punctuation omitted)). Gerver and the Appeals Committee plausibly construed the phrase "involuntarily terminated," and their decision arguably comported with the purposes underlying the Plan. *See Allen v. Adage*, 967 F.2d 695, 702 (1st Cir. 1992) (observing that the "usual purpose" of a severance pay plan is "to provide employees with a buffer against the privations which so often attend unforeseen layoffs"). Hence, Gerver and the Appeals Committee did not act arbitrarily and capriciously in denying Farmer severance pay.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.